IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2001 Session


**STATE OF TENNESSEE, DEPARTMENT OF
CHILDREN'S SERVICES v. D.R., ET AL.
IN THE MATTER OF: C.R.R., D.R.R. AND S.J.R.**

**Appeal from the Juvenile Court for Blount County**
**No. 7683-31-10    William Terry Denton, Judge**

**FILED SEPTEMBER 25, 2001**

**No. E2000-01381-COA-R3-CV**

These parents of three minor children ("Children") were arrested in April 1998, while the Children were with them, for possession of a firearm, drug possession, and public intoxication. The State of Tennessee, Department of Children's Services ("DCS"), filed a Petition for Temporary Custody of the Children which was granted. Thereafter, DCS entered Plans of Care with the Juvenile Court with which the parents, D.R. ("Mother") and L.M.R. ("Father"), had agreed. The Children remained in foster care for eighteen months during which time the parents were to work toward completing the goals set forth in the Plans of Care so they could be reunited with the Children. In August 1999, DCS filed a Petition to Terminate Parental Rights. The Juvenile Court Referee heard this petition in October 1999, and granted it. The Juvenile Court Referee's Termination of Parental Rights and Final Decree of Guardianship was entered in April 2000 and confirmed by the Juvenile Court Judge in June 2001. Both Mother and Father appeal. We affirm.

**Tenn. R. Civ. P. 3 Appeal as of Right;**
**Judgment of the Juvenile Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Sandra E. Myatt, Maryville, Tennessee, for the Appellant, D.R., and Richard L. Gann, II, Sevierville, Tennessee, for the Appellant, L.M.R.

Paul G. Summers and Douglas Earl Dimond, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.

1

## OPINION

## Background

In April 1998, the State of Tennessee, Department of Children's Services obtained temporary custody of the three minor children of, Mother, age 24, and Father, age 38, who were married in 1993. Mother's arrest for possession of a firearm and Father's arrest for public intoxication and possession of a Schedule V substance, Xanax, precipitated the filing of a Petition for Temporary Custody by DCS. At the time of the parents' arrests, the minor Children, approximate ages one, three, and four, were in a vehicle with their parents in a neighborhood known for drug activity. During the parents' arrest in April 1998, one of the arresting officers pointed his gun at Father. The oldest Child, age four, in an effort to protect Father, put himself in harm's way between the officer and Father. This Child also told the police officer that they were not there to buy drugs and that Mother's gun was not loaded.[1]

Both parents were incarcerated for a short period of time after their arrests. DCS' Petition for Temporary Custody was granted by the Juvenile Court. Thereafter, Mother absconded with the Children to an unknown location. This precipitated the filing of a second Petition for Temporary Custody by DCS. Mother, acting upon the advice of her attorney, returned the Children shortly thereafter to DCS custody. About the same time, Father attempted suicide and was admitted to a psychiatric hospital. In May 1998, Father began a jail sentence related to his April 1998, arrest and was incarcerated until late July 1998.

DCS entered Plans of Care with the Trial Court, and a Guardian *ad litem* was appointed.[2] The Plans of Care prepared by DCS required the parents to take several affirmative steps to regain custody of the Children. The parents' goals included obtaining drug and alcohol counseling to become alcohol and drug free; avoiding others involved or associated with criminal activity; maintaining a stable, safe, and clean home for the Children; obtaining regular medical care for the Children; attending parenting classes and counseling for domestic violence; and informing DCS of any changes in address or circumstances.

In June 1998, the Guardian *ad litem's* first report was filed and recommended that the Children remain in protective custody. This report outlined violent acts between the parents and by others which were witnessed by the Children, both before they were taken into protective custody and after DCS custody during unsupervised visits with the parents. The report further outlined

---

[1] It was later discovered that Mother's gun was, in fact, loaded.

[2] The record on appeal shows some confusion regarding the date that the Plans of Care were signed by the parents and by DCS and were filed with the Juvenile Court clerk. At any rate, the parents did not dispute that they signed the Plans of Care after DCS reviewed the documents with them and that they received a copies of the Plans of Care. Both parents also admit receiving and executing copies of the DCS' policy regarding termination of parental rights.

parental negligence as to the Children and stated that the oldest Child had an untreated cataract in one eye which Mother acknowledged caused the child to suffer headaches and would eventually cause blindness. The Child was diagnosed with this condition in 1996, a condition which was then treatable. The record on appeal shows that, by August 1998, however, this condition had progressed so far in one eye that it was not treatable and had caused the Child to lose most, if not all, of his sight in that eye.

In August 1998, the Juvenile Court entered an Order which found that the Children were dependent and neglected and made them wards of the Court but awarded the parents visitation. For the remainder of 1998, the Guardian *ad litem* reported that Mother was not complying with any aspect of the Plans of Care except for visitation. The reports showed that in 1998, the parents were sporadically employed and that they were separated, claiming they wanted a divorce.

The proof in the record shows that in January 1999, the parents attempted to live together again for approximately three weeks. On a Monday immediately following a weekend of unsupervised visitation with the Children during this short reconciliation, Mother reported that Father had given her a black eye and had him arrested for assault. Father was arrested on January 25 for this assault, and again arrested on February 7 and February 26, 1999, for various offenses, including violating the Motor Vehicle Habitual Offenders Act. Two days after Mother reported her black eye, she attempted to run over Father with a vehicle which resulted in an assault charge. Father also obtained an arrest warrant against Mother for the theft of his vehicle. In light of these circumstances, in February 1999, the Juvenile Court entered a Restraining Order and No Contact Order ("Restraining Order") prohibiting visitation with the Children.

A hearing was held in March 1999, regarding the Restraining Order and the parents' compliance with the Plans of Care. The Juvenile Court held, in its order, neither parent was complying with the Plans of Care and stated that Mother was present but had waived the presence of her counsel. The order reinstated Mother's visitation on a limited, supervised basis only. For reasons not provided by the record on appeal, the order from the March 1999, hearing was not entered until October 1999.

In June 1999, the Juvenile Court Referee held a hearing to review the parents' compliance with the Plans of Care and Mother's visitation schedule. The Referee continued Mother's limited, supervised visitation. The order from this hearing states that neither Mother nor her attorney were present at the hearing and that Mother's whereabouts were unknown. Father was still incarcerated.

In August 1999, DCS filed a Petition to Terminate Parental Rights ("Petition to Terminate"), citing several grounds. The Petition to Terminate was heard by the Referee in October 1999 ("termination hearing"). The testimony at the termination hearing painted a bleak picture of the parents' fitness to regain custody of the Children. Both parents had continued to participate in criminal conduct. At the time of the termination hearing, Mother was incarcerated for pending charges of theft and burglary. Mother testified that she and a friend of hers had been arrested for

3

theft and burglary of the home of a male friend with whom she had lived. She also had various other pending charges, including a gun charge from the April 1998, arrest; an assault charge from the January 1999, incident with Father; and a disorderly conduct charge.

Of the eighteen months since DCS obtained temporary custody of the Children in April 1998, Father had been incarcerated between eight and ten months for various convictions. For his most recent incarceration, Father had been in jail from February to late August 1999. The record on appeal shows that Father's probation officer testified about Father's extensive arrest record which, on average, included at least one arrest a year for the previous ten years. Father's arrest record contains a plethora of offenses, including aggravated and simple assault, DUI, public intoxication, disorderly conduct, and driving on a suspended license. As discussed, Father was incarcerated over half of the eighteen-month period when he was to be working toward completing his Plan of Care. Unsurprisingly, Father testified he had struggled with alcohol for approximately twenty four years. Father recently had sought treatment and counseling for his alcohol problem but at the time of the hearing, had not solved his alcohol problem. In addition, although Father denied use of drugs, it was reported that he used crack cocaine, heroine, and marijuana in early 1999. Father, nevertheless, was usually employed full-time when he was not incarcerated and had a home which he rented from his mother.

The testimony also showed that the parents had not taken steps to provide a safe and stable home for the Children. At the time of the termination hearing, Mother had been living in Gatlinburg for one week and had been employed for one week. Because of this very recent change in circumstances, Mother testified that she was stable and believed that she could adequately care for and support the Children. Prior to this job, however, Mother had been unemployed for approximately one year, without any source of income, during which time Mother described herself as having "lost it." In addition, Mother, in the eighteen months since the Children were taken into temporary custody, had been living with various people, including male friends, in Knox and Blount Counties. Mother, in fact, testified that she could not recall the name of one particular male friend with whom she lived for a short period of time. Additionally, Mother had stopped taking her anti-depressant and anxiety medication and stopped treatment for those problems. Mother's last visit with the Children was in April 1999, and her last contact with DCS was at that time. Mother testified that she believed the Restraining Order kept her from visiting the Children and claimed she did not know that it had been lifted. Mother admitted, however, that after April 1999, DCS did not know where to find her to serve her with any court pleadings.

Although the Guardian *ad litem's* reports show that Father previously indicated that he could not take care of the Children by himself, Father testified that he could care for the Children but that it would be very difficult since he did not have a driver's license or a vehicle. Father testified that he originally hoped Mother would become stabilized so that she could regain custody of the Children and he merely could pay child support and have visitation with them. Neither parent paid child support during the time the Children were in foster care, but testified they were never told to pay any support for the Children. Additionally, both parents testified that the oldest Child's physicians had told them the cataract surgery could wait.

4

Moreover, the testimony at the termination hearing showed that the parents' domestic violence had not decreased since the Children were taken into temporary custody in April 1998. Prior to the April 1998, incident, Mother testified that she was frequently hit, slapped and kicked by Father in front of the Children. During a car trip out-of-state, Mother testified that Father cut her face with a knife in front of the Children. Similarly, Father testified that Mother stabbed him in the side; broke his arm; tried to burn down his house; and attempted to run over him with a vehicle. Mother did not deny breaking Father's arm, claiming it was the only time she was the first aggressor since, typically, Father would hit her first and then she would fight back. Mother also did not deny hitting Father with her car in January 1999, stating that she "bumped" him with the vehicle because he refused to get out of her way. In fact, Mother testified that she tried to hit him with a vehicle on a total of three occasions.

The Juvenile Court Referee, at the close of proof, held that Mother's and Father's parental rights to the Children were terminated. The Referee stated "I'm not going to track the statutory language. I'm going to ask the State to track the statutory language in drafting the Order." Six months after the hearing, on April 28, 2000, the Referee entered a Termination of Parental Rights and Final Decree of Guardianship ("Final Decree"), *nunc pro tunc*, holding that the parents' rights were terminated for a number of grounds, including their non-compliance with the Plans of Care, their abandonment of the Children, their failure to remedy the conditions which led to the removal of the Children, and the risk of substantial harm to the Children that still persisted in the event the Children were returned to the parents. *See* Tenn. Code Ann. §§ 36-1-102(1)(A); 36-1-113(g)(1), (2) & (3)(A).[3] The Referee's Final Decree also found that it was not in the best interests of the Children to return them to them the parents, tracking the statutory language from Tenn. Code Ann. § 36-1-113(i)(2) & (7) - (8).

The record on appeal shows that the Final Decree did not contain the signatures of any of the attorneys, including the DCS attorney who apparently drafted the Final Decree. Nevertheless, the parents' counsel, in the appellate briefs, state they received a copy of the Final Decree within a few days of its entry.[4] Both parents filed Notices of Appeal in May 2000. The Final Decree was not ratified and confirmed by the Juvenile Court Judge until June 2001.[5]

---

[3] The Juvenile Court specifically held that both parents had abandoned the Children for willfully failing to support the Children and that Mother had abandoned the Children for her willful failure to visit the Children with the exception of token visitation. See Tenn. Code Ann. § 36-1-102(1)(A)(i). The Juvenile Court's Final Decree also held that the Children were abandoned under the second statutory definition of "abandonment," found at Tenn. Code Ann. § 36-1-102(A)(ii), as well.

[4] Father's counsel states that he received a copy of the Final Decree on May 1, 2000, while Mother's counsel states that she received a copy in April 2000.

[5] Father raises as an issue on appeal the failure of the Juvenile Court Judge to confirm the Final Decree as required by Tenn. Code Ann. § 36-1-102(14)(C). Upon motion by DCS, however, the record on appeal was supplemented to include the Juvenile Judge's Order confirming and ratifying the Final Decree. As a result, this issue is moot.

## **Discussion**

On appeal and although not exactly stated as such, both Mother and Father raise the following issues: (1) whether the Juvenile Court Referee erred in ordering DCS to "track the language of the statute" in preparation of the Final Decree; (2) whether the Juvenile Court Referee erred in failing to enter the Final Decree within thirty days after the date of the termination hearing as required by Tenn. Code Ann. § 36-1-113(k); and (3) whether the Juvenile Court erred in applying an unconstitutional definition of "abandonment" when it held that the parents had abandoned the Children by willfully failing to support them.

Although not exactly stated as such, Mother raises additional issues on appeal: (1) whether the Juvenile Court erred in holding that Mother abandoned the Children by willfully failing to visit them in the four consecutive months prior to the filing of the DCS Petition to Terminate; and (2) whether the Juvenile Court Referee erred in holding three hearings, which preceded the termination hearing, without the presence of Mother and/or her counsel.

In addition and although not exactly stated as such, Father raises the following issues on appeal: (1) whether the Juvenile Court Referee erred in entering the Final Decree without the prior approval of any of the attorneys; and (2) whether there was clear and convincing evidence providing a basis to terminate Father's parental rights and to support the Juvenile Court's finding that it was in the best interests of the Children that Father's rights be terminated.

DCS raises no additional issues on appeal but argues that the Juvenile Court's decision to terminate the parents' rights to the Children is supported by clear and convincing evidence. DCS also contends that if the remaining issues raised by the parents constitute error, at most, only harmless error occurred.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Alexander v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997).

We first address the parents' issues regarding the validity of the Final Decree since these issues are potentially dispositive of this matter. Both parents contend that it was error for the Juvenile Court Referee to ask DCS, in preparation of the Final Decree, to track the language of the termination statute. The parents argue that, consequently, the Final Decree failed to include the Juvenile Court's findings of facts. In addition, the parents contend that the Juvenile Court Referee erred by failing to enter the Final Decree within thirty days after the final hearing. Finally, Father contends on appeal that it was error for the Juvenile Court Referee to enter the Final Decree without first circulating a draft between the parties' counsel and obtaining the approval and signatures from them.

6

We agree that the Final Decree did not comply with the time element of Tenn. Code Ann. § 36-1-113(k) which provides that "[t]he court shall enter an order which makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." The Final Decree was entered six months after the hearing, but it does contain sufficient findings of fact and conclusions of law. The Tennessee Rules of Juvenile Procedure apply to this case since it involves termination of parental rights. Tenn. R. Juv. P. 1(b). The juvenile court procedural rules do not have a provision which sets forth specific requirements to be met before entry of a judgment is effective. Parents cite no authority in support of their position, and we, likewise, find none. Rule 34 (a) of the Tennessee Rules of Juvenile Procedure does, however, provide a means of obtaining relief from orders for clerical mistakes. The technical record on appeal shows that neither parent sought relief relative to the failure to have the Final Decree entered within thirty days of the conclusion of the hearing. Instead, the parents filed notices of appeal. A party who "[fails] to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief on appeal. Tenn. R. App. P. 36(a) & advisory committee's note. Moreover, it is well-settled that issues not raised at trial may not be raised for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union,* 810 S.W.2d 147, 153 (Tenn. 1991); *Dep't Human Serv. v. DeFriece,* 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). Finally, we hold that given the facts and circumstances presented to us in the record, the failure to have the final decree entered within thirty days of the conclusion of the hearing was harmless error. *See* Tenn. R. App. P. 36(b).

We next address the issues raised by Mother and Father regarding the Juvenile Court's determination that there was clear and convincing evidence of grounds to terminate their parental rights. It is well-established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be a shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d at 188.

Initiation of termination of parental or guardianship rights may be based upon any of the following three statutory grounds:

(1)    Abandonment by the parent or guardian, as defined in [prior law], has occurred;[6]

(2)    There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A)    The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

        (i)    The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse

---

[6] As discussed in more detail infra, the statutory definition of "abandonment" referenced in this statute has been declared unconstitutional. Hence, we have substituted "prior law" to reference the law which is to be applied until the statute is amended by the legislature.

or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g).

In this matter, the Juvenile Court found that all three of the statutory grounds for termination, set forth in Tenn. Code Ann. § 36-1-113(g), were proven by clear and convincing evidence. We first address the second and third statutory grounds as set forth in Tenn. Code Ann. §§ 36-1-113(g)(2) - (g)(3)(A)(i)-(iii).

The Juvenile Court found there was clear and convincing evidence that both Mother and Father substantially failed to comply with the Plans of Care. *See* Tenn. Code Ann. § 36-1-113(g)(2). In making this determination, the Juvenile Court had access to the quarterly reports of the Guardian *ad litem* and heard testimony from the parents, representatives of DCS, and Father's probation officer. "Unlike this Court, the [Juvenile Court], observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The Trial Court's determinations regarding credibility are accorded deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

The proof in the record supports the Juvenile Court's finding that the parents substantially failed to comply with the Plans of Care. In fact, the proof in the record overwhelmingly supports the Juvenile Court's findings that the parents substantially failed to comply with the Plans of Care. Neither of the parents met the Plans of Care requirements to attend parenting classes; to avoid criminal behavior and those associated with criminal conduct; to maintain a safe and stable home environment; and to maintain contact with DCS regarding a change in address or other circumstances.

For at least twelve months of the eighteen-month period that the Children were in DCS' temporary custody, Mother was unemployed, without any source of income, and moving from

place to place. Mother also was charged, along with a friend of hers, with burglary and theft during this period of time. Moreover, Mother failed to comply with the Plans of Care by not visiting with the Children. We acknowledge that the Juvenile Court Referee entered a Restraining Order in February 1999, which prohibited the parents from visiting the Children. The Restraining Order, however, was lifted in March 1999.[7] Mother explained at the final hearing that she did not visit the Children because she believed that the Restraining Order prohibiting visitation had never been lifted. By Mother's own admission at trial, however, she did not keep DCS informed of her whereabouts after April 1999, so that she could have been informed of any changes in her visitation.

As discussed, Father was incarcerated for approximately half of the eighteen-months that he was supposed to be working toward completing his Plans of Care. Some of his jail time was due to charges he incurred after DCS obtained temporary custody of the Children. Father also failed to comply with the Plans of Care's requirement that he become alcohol and drug free as he continued to use both, especially alcohol, and failed to complete successfully any dry-out program. With respect to the presence of domestic violence in the parents' relationship, this situation had not improved in the least. We acknowledge that Mother has assaulted Father, but Mother also testified that Father has repeatedly assaulted her during their relationship, and the Children have witnessed this violence. The most telling testimony, perhaps, of Father's lack of motivation was Father's testimony that he had hoped Mother would become stabilized so that she could keep the Children, and he could merely visit them and pay child support. At best, Father has been consistently employed when not incarcerated and, unlike Mother, has a regular place to call his home.

In light of the extensive proof in the record on appeal and the deference we must afford the Juvenile Court's findings of credibility, we affirm the Juvenile Court's determination that there was clear and convincing evidence the parents failed to comply substantially with the Plans of Care. We, therefore, find no error in the Juvenile Court's determination that grounds for termination of the parental rights, under Tenn. Code Ann. § 36-1-113(g)(2), of both parents were established by clear and convincing evidence.

Also, we hold that the Juvenile Court did not err in holding that additional grounds for termination of the parental rights, set forth in Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) – (iii), were proven by clear an convincing evidence. First, the Children had been removed from the parents' home for more than six months by order of the Juvenile Court. Tenn. Code Ann. § 36-1-113(g)(3)(A). Second, the conditions which led to the Children's removal, which include the parents' criminal conduct, domestic violence, the parents' neglect of the Children's health, and Father's alcohol and drug abuse would cause the Children to be "subjected to further abuse or neglect and . . . prevent[s] [the Children's] safe return to the care of the parents . . . still persist[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Third, as evidenced by the parents' failure to remedy these conditions and their failure to meet their Plans of Care in a more than adequate period of time,

_____

[7] As discussed, the Restraining Order from the March 1999 hearing was not entered until October 1999. In June 1999, however, the Referee reviewed the limited visitation that Mother had been granted at the March 1999, hearing and affirmed the visitation schedule.

"[t]here is little likelihood that these conditions will be remedied at an early date so that the [Children] can be safely returned to the parents . . . in the near future[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Finally, in light of the parents' nearly total lack of compliance with the Plans of Care and the Children's young ages, "[t]he continuation of the . . . relationship [between the parents and the Children] greatly diminishes the [Children's] chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). We affirm, therefore, the Juvenile Court's determination that there was clear and convincing evidence establishing grounds for termination of Mother's and Father's parental rights under Tenn. Code Ann. § 36-1-113(g)(3).

We now turn our inquiry to the parents' issue regarding the Juvenile Court's determination that the parents had abandoned the Children. Both Mother and Father contend on appeal that the Juvenile Court used an unconstitutional definition of the term "abandonment." They are correct, and, therefore, we agree that the Juvenile Court erred in finding that the parents had abandoned the Children for willfully failing to support or make reasonable payments toward the support of the Children for more than four consecutive months prior to the filing of DCS' Petition to Terminate. *See* Tenn. Code Ann. § 36-1-102(1)(D). We also agree with Mother's argument on appeal that the Juvenile Court erred in holding that she abandoned the Children by willfully failing to visit the Children for more than four consecutive months prior to the filing of the DCS Petition to Terminate. *See* Tenn. Code Ann. § 36-1-102(1)(E).

The Juvenile Court, in making this determination, used the two statutory definitions of the term "abandonment" found at Tenn. Code Ann. §§ 36-1-102(1)(D) and (1)(E), willful failure to support and willful failure to visit. The Supreme Court, however, in *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999), held that the "willful failure to support" definition of abandonment was unconstitutional because it created an "irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional . . . ." *Id.* at 188. The Court further held that "[u]ntil otherwise amended by our legislature, the definition of abandonment that was in effect under prior law shall be applied." *Id.* at 189. Thereafter, this Court, citing *In re Swanson*, used the prior statutory law from 1994 for both of the above definitions of the term "abandonment." *In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000).

Both the *In re Swanson* and *In re Adoption of Copeland* decisions were issued prior to the entry of the Final Decree in this matter. Because the Juvenile Court applied an unconstitutional definition of "abandonment" as one of the grounds for terminating Mother's and Father's parental rights, we vacate this portion of the Final Decree. We need not remand this case to the Juvenile Court for a determination utilizing the definition of "abandonment" under prior law of whether the parents abandoned the Children because we have affirmed the Juvenile Court's judgment that other statutory grounds for termination are met under Tenn. Code Ann. §§ 36-1-113 (g)(2) and (g)(3).

Having affirmed that two of the three statutory grounds for termination were proven by clear and convincing evidence, we next address Father's issue regarding whether the Juvenile Court erred in holding that the termination of his parental rights is in the best interests of the

Children. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or

> emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

As discussed, the record on appeal shows that Father failed to comply with his Plans of Care; did not become free of drug and alcohol use; continued his criminal activity and domestic violence; was incarcerated for approximately one-half of the time that he was supposed to be working toward his Plans of Care; tried to commit suicide for which he was hospitalized; and failed to pay child support. Due to these circumstances, we hold that at least seven of the nine factors outlined in Tenn. Code Ann. § 36-1-113 (i) are present. Accordingly, we find no error with the Juvenile Court's determination that termination of Father's parental rights is in the best interests of the Children.[8]

The remaining issue on appeal concerns Mother's argument that the Juvenile Court erred in conducting three hearings, on March 10, 1999, on June 16, 1999, and on August 20, 1999, without the presence of Mother and/or her counsel. All of these hearings preceded the termination hearing where both Mother and her counsel were present. The record on appeal shows that Mother had counsel during the 1998 proceedings. At the hearing held in March 1999, Mother was present but without counsel, and the Juvenile Court Referee found, in its order, that she waived presence of her attorney. Mother was not present at all for the second hearing held on June 16, 1999, nor was an attorney present on her behalf. At the third hearing, held in August 1999, Mother was present but without counsel.

Tenn. R. Sup. Ct. § 1, 13(d)(7) states that parents have a right to counsel at all stages of proceedings involving dependency and neglect issues or termination of parental rights. Mother, however, did not raise this issue at the trial level. As discussed, issues not raised at trial may not be raised for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d at 153; *Dep't Human Serv. v. DeFriece*, 937 S.W.2d at 960. In addition, upon consideration of the record as a whole and since Mother was present and represented by counsel at the termination hearing, we hold that if this constituted error, it did not "more probably than not [affect] the judgment[,]" nor did it "result in prejudice to the judicial process." Tenn. R. App. P. 36 (b); *see also Dep't Children's*

---

[8] While Mother did not raise this specific issue, if she had, we would have found no error with the Juvenile Court's determination that termination of her parental rights was in the best interest of the children as well.

*Serv. v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at * 2 (Sept. 15, 1999) (citations omitted) (holding that no due process violation occurs where the appellant parent participates in the termination hearing and "'there asserted her plenary rights; any lack of due process initially was thereafter fully supplied'"). Moreover, the only hearing that Mother did not attend was in June 1999, and occurred during the time that Mother admitted that her whereabouts were unknown to DCS. Relief is not granted to a "party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a).

Acceptance of Mother's position on this issue would lead to the outlandish conclusion that once a hearing was held without Mother's or her attorney's attendance, for whatever reason, the Juvenile Court would be powerless later to hold any hearing terminating Mother's parental rights. Such is not the law. Accordingly, due to the facts and circumstances presented by the record on appeal, we find no reversible error in the Juvenile Court's holding of three hearings, all prior to the termination hearing, without the presence of Mother and/or her attorney.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellants, D.R., and L.M.R, and their sureties.

_____
D. MICHAEL SWINEY, JUDGE